**NEONEX INTERNATIONAL LTD.,**
**Plaintiff,**

v.

**NORRIS GRAIN COMPANY and Bruce**
**A. Norris, Defendants.**

**No. 71 Civ. 2880.**

United States District Court,
S. D. New York.

March 6, 1972.

Davis, Polk & Wardwell, New York City, for plaintiff by S. Hazard Gillespie, William H. Levit, Jr., New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants by Stephen M. Axinn, Michael H. Diamond, Edward J. Yodowitz, New York City, of counsel.

GURFEIN, District Judge.

On June 29, 1971 plaintiff Neonex International Ltd. (Neonex) filed this action seeking $32,000,000 in damages for breach of a stock acquisition contract. On August 20, 1971 defendants served their answers, together with this omni-

bus summary judgment motion[1] which seeks dismissal of the complaint and recovery on two counterclaims, based on the argument that it was the plaintiff who breached, in the total amount of about $2,000,000.[2]

Defendants' motion also seeks, *inter alia*, a protective order pursuant to Fed. R.Civ.P. 26(c) which would limit any discovery, if summary judgment is denied, to any issues of fact found to be in dispute.

Neonex is a Canadian corporation. Norris Grain Company (Norris Illinois) is an Illinois corporation which has its principal place of business in Illinois and does business in New York. Bruce A. Norris, the other defendant, is Chairman and President of Norris Illinois, and is a citizen of Illinois and a resident of New York. Diversity of citizenship and the jurisdictional amount exist.

The complaint contains two claims for relief. The first claim is against the defendant Norris Illinois for breach of contract.[3] The first claim, with supporting affidavits, sets forth the following allegations:

In 1969, Norris Illinois owned directly 171,271 common shares of the Canadian corporation Maple Leaf Mills Ltd. (Maple Leaf), which comprised 10.5% of its outstanding capital stock. Norris Illinois also owned 100% of Norris Grain Company Ltd. (Norris Winnipeg), a Canadian corporation. Norris Winnipeg, in turn, owned 66⅔% of still another Canadian corporation, Upper Lakes Shipping Ltd. (Upper Lakes). This 66⅔% was represented by 235,728 shares of the preferred stock and 117,864 shares of the common stock. Upper Lakes, in its turn, owned 450,771 shares of Maple Leaf, amounting to 28% of Maple Leaf's outstanding capital stock.

Norris Winnipeg, in addition to its 66⅔% ownership of Upper Lakes, also owned 331,672 shares of Dominion Foundries and Steel, Ltd. (Dofasco), a Canadian company which was publicly traded on the Toronto Stock Exchange. The market value of the Dofasco holdings of Norris Winnipeg was about (Can.) $7,000,000.

The remaining 33⅓% of the stock of Upper Lakes was owned by the Canadian corporation Leitch Transport Ltd. (Leitch), so that Norris Winnipeg together with Leitch owned all of Upper Lakes. Leitch (in addition to Upper Lakes' ownership of 28% of Maple Leaf) owned in its own right 230,869 common shares of Maple Leaf, or an additional 14%. Thus, Norris Illinois, Upper Lakes and Leitch together controlled almost 53% of the capital stock of Maple Leaf. Leitch also owned Dofasco shares having a market value of at least (Can.) $13,500,000.

Neonex wanted to buy control of Maple Leaf. In order to do so, it wanted to acquire the Maple Leaf shares which were controlled by the three companies, Norris Illinois, Upper Lakes and Leitch.

The Norris interests wanted a largely tax free transaction. The negotiations between Neonex and Norris Illinois resulted, on December 16, 1969, in two agreements: the so-called Principal Norris Agreement and the Norris Option Agreement. The Principal Norris Agreement provided that Norris Illinois would exchange its 100% stock ownership in Norris Winnipeg for 2,500,000 common shares of Neonex, which represented about 27% of Neonex stock. Neonex, by buying Norris Winnipeg

---

1. There is also a motion under Fed.R.Civ. P. 12(c) for a judgment on the pleadings in favor of the defendants.

2. Their answers contained an additional counterclaim, on which summary judgment is not sought, seeking damages in the amount of $50,000,000 for defamation, which defendants allege to have occurred as a result of plaintiff having stated in its 1970 annual report, and elsewhere, that defendants had defaulted on the agreements at issue in this action.

3. The second claim, which is against Bruce A. Norris, repeats the allegations of the first claim and further alleges that he failed to perform his obligations under his letter of December 23, 1969, which is set out *infra*.

was, in effect, getting 66⅔% of Upper Lakes (which in turn owned 28% of Maple Leaf), as well as the valuable publicly-traded Dofasco shares owned by Norris Winnipeg. In order to obtain control of Maple Leaf, said to be the objective of Neonex, it also entered into the Norris Option Agreement which gave Neonex the option to buy for cash from Norris Illinois (with a correlative option to the latter to sell to Neonex) the 171,271 common shares of Maple Leaf which Norris Illinois owned. The option price was fixed at (Can.) $4,281,775, and Neonex paid Norris Illinois (Can.) $856,355 for the option.

A closer look at these contracts is necessary. Section 1.1 of the Principal Norris Agreement, in pertinent part, reads as follows:

> "Norris Winnipeg is, or prior to the Closing Date, will be, the owner, free and clear of all liens . . . and other encumbrances of 235,728 shares of Preferred Stock and 117,864 shares of Common Stock of Upper Lakes Shipping Ltd. . . . and 331,672 shares of Common Stock of Dominion Foundries and Steel, Ltd."

Section 5 of the Principal Norris Agreement reads as follows:

> "Section 5. *Closing.* Consummation of the transaction contemplated by Section 3.1 shall take place at the office of Norris Winnipeg in Winnipeg, Manitoba at the option of Neonex at any time upon 5 days' written notice to Norris Illinois (the 'Closing Date') ; *provided that Norris Illinois shall have 60 days to comply with the representation and warranties contained in Section 1* (other than the representation and warranty contained in the first sentence of Section 1.1 relating to the ownership of the capital stock of Norris Winnipeg to be delivered to Neonex upon such 5 days' notice) in which event the Purchase Price to be delivered to Norris Illinois shall be held in escrow until such compliance by Norris Illinois ; and provided further that, without the mutual written consent of Neonex and Norris Illinois, such consummation shall not take place later than December 31, 1972 nor earlier than September 30, 1970." (emphasis added)

Notices "shall be sufficiently given" if sent by registered mail or certified mail (§ 10.3). There is no clause stating whether time is or is not of the essence, but as stated in Section 5 "such consummation shall not take place later than December 31, 1972 nor earlier than September 30, 1970."

Now let us trace the subsequent moves of the parties. It will be recalled that in order for Neonex to acquire control of Maple Leaf it had only two places to look to, the open market and Leitch. As might be expected, Neonex resorted to both. The contracts with Norris Illinois were signed on December 16, 1969, and on December 18 and 19, Neonex bought 14% of the outstanding stock of Maple Leaf on the Toronto Stock Exchange for (Can.) $5,764,337. The Norris people allegedly knew that Neonex was making these purchases.

At about the same time, Neonex began negotiations with Leitch through J. D. Leitch, its President, for the acquisition of Leitch's block of 14% of Maple Leaf. On December 23, 1969, a week after the Norris Agreements, Neonex reached an agreement with Leitch. The Leitch Agreement provided that: (1) Upper Lakes would first exchange its 450,771 shares of Maple Leaf for Leitch's Dofasco shares having a value of at least (Can.) $13,500,000; (2) Leitch in turn would sell these newly acquired 450,771 Maple Leaf shares to Neonex for (Can.) $3,000,000 in cash plus the 66⅔% of Upper Lakes which Neonex was expecting to receive under the Principal Norris Agreement; (3) Leitch, in addition to contracting to sell the Maple Leaf shares it would acquire from Upper Lakes, also gave Neonex an option to buy Leitch's own Maple Leaf shares, amounting to 230,869 shares, for $5,771,725; this call to Neonex was accompanied by a put to Leitch and by

Neonex's payment of (Can.) $1,154,345 as consideration for the call.

It was apparent that the Leitch Agreement with Neonex could not be consummated unless Upper Lakes, still under the control of Norris Winnipeg, delivered its Maple Leaf shares to Leitch so that Leitch could perform its agreement to sell them to Neonex; moreover, this latter sale involved the exchange of the 66⅔% of Upper Lakes still owned by Norris Winnipeg. Accordingly, it was proposed that Norris Winnipeg be made a party to the Leitch-Neonex agreement. The attorney for the Norris interests, Mr. Vincent, demurred on the basis of tax advice but agreed to have Bruce A. Norris personally sign on December 23 a "best efforts" letter reading as follows:

"Dear Sirs:

In consideration of your execution and delivery of the agreement dated today with Leitch Transport Ltd., I covenant and agree with you that I shall devote my best efforts to ensuring that Norris Grain Company Limited duly carries out and performs the transactions on its part contemplated by that agreement, and that its directors and shareholders will duly authorize the transactions on its part contemplated by that agreement.

Sincerely,
/s/B. A. Norris."

It will be noted that the letter is not addressed to Leitch but to "Neonex International Limited" in consideration of the latter's execution of the Leitch Agreement. This is the only writing additional to the Leitch Agreement of even date and the earlier Norris-Neonex Agreements of December 16. As we shall see, this "best efforts" letter has a bearing on the motion for summary judgment based on the December 16 contracts.

On August 17, 1970 Neonex served Norris Illinois with written notice fixing the "Closing Date" for their Agreements as September 30, 1970. Neonex claims that it gave notice of that closing date to counsel for the defendants even earlier by word of mouth. Neonex further contends that after it had given the written notice of closing to Norris Illinois, the latter falsely stated that it was not in a position to close because of its financial condition, having allegedly suffered heavy market losses. Be that as it may, both parties appeared at the closing, on September 30, in Toronto.

The defendant Norris Illinois contends that it tendered to Neonex: (1) certificates in proper form representing all the outstanding stock of Norris Winnipeg, free of liens and encumbrances; (2) a certification by Norris Winnipeg that it was the owner of 235,728 shares of preferred stock and 117,864 shares of common stock of Upper Lakes; (3) all the other documents, certificates and opinions required under the Principal Norris Agreement, except that it is agreed that Norris Illinois did not certify that the Dofasco shares were free of liens, but, instead, advised Neonex that *within 60 days from the Closing Date* Norris Winnipeg would own, free and clear of all liens and encumbrances, the 331,672 shares of Dofasco.

Neonex refused to accept this tender,[4] and consequently was unable to close the Leitch Agreement. Nevertheless, at the closing, Norris Illinois gave written notice to Neonex under the Norris Option Agreement to purchase the 171,271 shares of Maple Leaf which were the subject of the put option; Neonex refused to purchase these shares, however, when they were subsequently tendered.

To round out this part of the picture we should look at the crucial dates in the other agreements. The "put" gave Norris Illinois the right to require Neonex, on 5 days' notice, to purchase the shares at the agreed purchase price. This option was exercisable during a pe-

---

4. Neonex made subsequent compromise offers to close the Principal Norris Agreement, at later dates, but these were rejected by the defendants.

riod beginning the earlier of either the Closing Date in the Principal Norris Agreement or January 1, 1971 and ending on January 15, 1971. The Leitch Agreement provided that the sale of the Maple Leaf shares to Neonex "shall be completed on such date between March 1, 1970 and September 30, 1970 as shall be specified by Neonex (the actual time of such closing being hereinafter called the 'closing date')." The Upper Lakes-Leitch exchange of the Dofasco shares for Maple Leaf shares was to be completed "at the closing date or on such earlier date after March 1, 1970 as shall be specified by Neonex." Neonex was thus locked into September 30, 1970 as *the last* possible closing date for the Leitch Agreement and, under Section 5 of the Principal Norris Agreement, as *the earliest* closing date for the latter Agreement.

The critical question that this factual background presents is whether Norris Illinois was required to cause Norris Winnipeg to own the Dofasco shares free and clear on September 30, or whether Norris Illinois was entitled to a subsequent grace period within which to accomplish this. The plaintiff contends the former; it argues that this failure of Norris Illinois constituted a breach of the Norris-Neonex contract. The defendants argue that, by virtue of the grace period, their tender was proper and should have been accepted.

To be more specific, the defendants contend that Section 5 of the Principal Norris Agreement is clear and unambiguous and that under that Section they had an absolute right to rid the Dofasco stock of liens up to sixty days after the Closing Date for the Principal Norris Agreement. If this view is accepted, they argue, the undisputed facts make it clear that it was Neonex, not Norris Illinois, which breached the Norris Agreements; and that, therefore, the defendants are entitled to summary judgment dismissing the complaint and granting their counterclaims based on the plaintiff's breach.

In response, Neonex first contends that there is ambiguity regarding the point at which the sixty-day period was to begin running—whether upon actual notice, upon the date of written notice or upon the date of closing.

A second Neonex argument is that the intention of the parties was to grant the sixty-day grace period to the defendant only if the defendant was *unable* to clear the lien by the Closing Date. Neonex asserts that Norris Illinois was quite able to free the Dofasco stock from all existing liens on September 30, 1970 if it had only wanted to do so, but that Norris Illinois deliberately refrained from freeing the liens for its own business reasons. Neonex points to the alleged circumstance that its own stock had dropped in market price from (Can.) $95⅝ per share on December 16, 1969, when the Norris Agreements were signed, to (Can.) $3¾ per share on September 29, 1970, the day before the closing. Since, upon the closing the defendant Norris Illinois was to become a 27% owner of Neonex, the defendants allegedly found the Agreements increasingly unattractive. Neonex contends that it is ready to prove that it was Norris' desire to break the Leitch deal, and not its financial inability to free the liens on the Dofasco stock, that caused it to fail to tender its Dofasco stock free of lien. In support of its theory, Neonex offers proof through David S. Patterson, a Vice President of The First National Bank of Chicago, that the Bank, which had made a loan to Norris Illinois and which had the lien on the Dofasco shares, was prepared to release them at the closing of September 30 for delivery to Neonex. Patterson has sworn, by deposition, that the lien could have been removed by simply making a telephone call to the Bank of Montreal where the shares were actually held.

A third contention of Neonex is that by their statements and conduct subsequent to December 16, 1969 the parties amended the Principal Norris Agreement to require delivery of the Dofasco

shares on the Closing Date. The plaintiff urges further that the statute of frauds is satisfied or alternatively that the defendants are estopped from asserting any statute of frauds defense. It is argued that the defendants knew that the Leitch Agreement had essentially modified the requirements of Neonex and that Neonex now needed the Dofasco stock to meet its own commitments; and, therefore, Norris Illinois cannot now contend that the claimed oral modification of the sixty-day grace period was unenforceable under the statute of frauds.

In support of this third contention, Neonex points to particular circumstances. During the Spring of 1970, Davis Polk, together with officers of Neonex, prepared a Neonex registration statement and prospectus which was filed with the SEC on May 27, 1970. These documents described the Maple Leaf transaction and how Neonex proposed to pay for its acquisition of Maple Leaf. The prospectus stated that by reason of the Leitch Agreement the Principal Norris Agreement would be closed on September 30, 1970, and that "to complete its acquisition commitments" Neonex intended to sell the Dofasco shares to be acquired from Norris Illinois. The proofs of the registration statement were sent to Mr. Vincent, the attorney for Norris Illinois, for comment.

Also, it is inferred by Neonex that when Bruce Norris signed the "best efforts" letter in connection with the Leitch Agreement, he understood that it was intended to include, as part of his best efforts, getting the Dofasco shares into the hands of Neonex so that the latter could use the proceeds from their sale to meet its other known commitments. Moreover, Neonex contends that, in view of his knowledge of the Leitch Agreement, Norris then understood that a September 30 closing was the latest possible date under that agreement—not sixty days thereafter.

It is also asserted by the plaintiff that Pattison, the head of Neonex, had discussions with Norris on a number of occasions after the Leitch agreement was signed and that Norris made it clear that he understood the proceeds which Neonex expected to receive from the sale of the Dofasco shares would be used to pay for the shares of Maple Leaf under the Norris Option Agreement and to complete the Leitch transactions.

In addition to these three contentions, the plaintiff also argues that the defendants anticipatorily repudiated the Norris Agreement; and furthermore that the defendants breached by refusing to accept Neonex's offers to close made after the September 30 Closing Date, these offers allegedly being in keeping with the intention of the parties since time was not of the essence.

A decision on the plaintiff's contentions should await a trial. For it seems clear that, in the complicated state of this matter, summary judgment will not lie. A motion for summary judgment may not be granted if there is a "genuine issue as to any material fact." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2 Cir. 1962): "[A]ll doubts as to the existence of a 'genuine issue as to any material fact' must be resolved against the moving party . . . The District Court must therefore take that view of the evidence most favorable to the opponent of the moving party, giving the opponent the benefit of all favorable inferences that may reasonably be drawn." Summary judgment is likewise inappropriate where extrinsic evidence may be admissible. See Lemelson v. Ideal Toy Corp., 408 F.2d 860 (2 Cir. 1969); Nathan v. Monthly Review Press, Inc., 309 F.Supp. 130 (S.D.N.Y. 1969).

The preliminary question for decision here is whether the Principal Norris Agreement is ambiguous and whether parol evidence may be admissible to explain it. Section 5 provides "that Norris Illinois shall have 60 days to com-

ply with the representations and warranties contained in Section 1." There is no specification of when the sixty days starts running. The defendants argue it means sixty days from the Closing Date. The plaintiff urges that it means sixty days from notice to Norris Illinois to put itself in a position to give the necessary representations and warranties. The plaintiff suggests that the sixty-day period commenced upon receipt of actual notice [5] of the Closing Date, and that such notice was allegedly received many months prior to the Closing Date.

The issue, therefore, is whether Section 5 is clear and unambiguous enough on its face to permit only the defendants' reading. As I read it, the sixty days could commence either upon notice or upon the date of closing, depending on what the parties intended. If the parties meant that sixty days was enough time for the clearing of liens, then presumably they would have meant the sixty days to run from actual notice that these liens should be cleared.[6] If the basic idea was to provide for two closings, then it could well be that the parties meant the sixty days to run from the date of the first closing.

In either event, there is a further ambiguity in whether the grace period was intended to be merely a calendar extension of sixty days, even if Norris did not need the time to clear the liens, or whether the sixty days were to come into play only if Norris Illinois actually needed that time to clear the liens.[7]

In New York,[8] ambiguity in an integrated agreement may be resolved by parol evidence. Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 57, 110 N.E.2d 551 (1953). See also, Union Insurance Society v. William Gluckin & Co., 353 F.2d 946, 951 (2 Cir. 1965); 3 Corbin on Contracts § 579 (1960). In such case, the trial court may resort to any available extrinsic evidence to ascertain the meaning intended by the parties. Arbuckle v. Lumbermens Mutual Casualty Co., 129 F.2d 791, 793 (2 Cir. 1942); Becker v. Peter A. Frasse & Co., 255 N.Y. 10, 14–15, 173 N.E. 905 (1930); Webb & Sons v. Hamilton, 30 A.D.2d 597, 290 N.Y.S.2d 122 (3rd Dept. 1968).

It is uncertain at this point what may develop from the testimony of the negotiators to resolve the ambiguity. But we have been instructed by our Court of Appeals in Union Insurance Society, *supra* (353 F.2d at 952):

"The court is not unaware of the possibility that the parties may be able to adduce but little additional competent evidence before the fact-trier on the issue of intent. Nevertheless, sound judicial administration strongly suggests that a court should not attempt to reconstruct the intent of the parties in a complicated factual situation before they have had an opportunity to present evidence on that

5. The written notice provided for in Section 5 can be seen as fixing only the Closing Date, and as being unrelated to the running of the sixty-day period; or conceivably written notice was waived by Norris Illinois. These issues likewise involve factual questions.

6. The escrow provision of Section 5 does not preclude this interpretation; instead, it could be seen as coming into play only if actual notice were given less than sixty days before the Closing Date.

7. If the latter is true, then the doctrine that a contracting party must perform obligations imposed by an implied requirement of good faith may come into play. See In re De Laurentiis, 9 N.Y.2d 503, 509–510, 215 N.Y.S.2d 60, 174 N.E.2d 736

(1961); Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933); Wood v. Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917). Without passing on the merits, it may be noted that Neonex asserts that Norris Illinois was quite able to free the liens on the Dofasco stock on the Closing Date and chose not to do so. Whether, if true, such conduct comes within the doctrine of the cases above cited remains for determination by the trial court, provided, of course, that this issue is reached.

8. The Norris Agreements, made in New York, also have a choice of law clause which fixes New York law as the applicable law. See Restatement (Second) of Conflict of Laws § 188 (1971).

issue before the fact-trier. Having determined that the existence of a triable issue of fact made the granting of summary judgment below improper, we are obliged to return that issue to the trier of fact. See Empire Electronics Co. v. United States, 311 F.2d 175, 180–181 (2d Cir. 1962). Cf. Asbill and Snell, Summary Judgment under the Federal Rules—When an Issue of Fact is Presented, 51 Mich.L. Rev. 1143, 1146 n. 15 (1953)."

■ Another question of fact arises from the claims of Neonex regarding their post-September 30, 1970 efforts to close the Norris Agreements. They allegedly made two bona fide offers to close, but these were immediately rejected by Norris Illinois. In this connection, the defendants argue that time was of the essence of the contract and that the resetting of a closing date by the plaintiff came too late, since Neonex was already in default. It is certainly open to question, as a factual matter, whether time was of the essence of this contract since it embraced the purchase of control of a corporation and the parties themselves stipulated that the closing might take place anywhere between September 30, 1970 and December 31, 1972—a period of more than two years. Whether a new closing date was tendered in such manner as to satisfy Neonex's contractual duties is a question for the trier of fact. If the trier finds an affirmative answer, it then will reach the further issue of whether the terms of these later offers conformed to the contract, an issue which likewise may require extrinsic evidence.

Just as the defendants' assertion of the parol evidence rule does not earn for it a summary judgment, as we have seen, so its assertion of the bar of the statute of frauds [9] also fails. Neonex contends that by oral agreement, evidenced by circumstances *after* the execution of the Principal Norris Agreement, Norris Illinois was to deliver the Dofasco shares, free of lien, on the Closing Date. Among the circumstances relied upon are the subsequent Leitch Agreement in which Norris participated by his "best efforts" letter; the registration statement of which the defendants had a copy, and which has been described above; and oral conversations with Bruce Norris. All this raises a question of fact as to whether there was an oral modification of the Principal Norris Agreement and whether, in the circumstances of alleged reliance, the defendants are estopped from asserting the statute of frauds.

■■ In New York the doctrine is well established that, even where a contract provides that there shall be no waiver or amendment not evidenced by a writing, "the prohibition of oral waiver, may itself be waived." Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 387, 122 N.E. 378, 381 (1919). And estoppel to assert the statute of frauds may be founded upon an oral agreement made *after* the execution of the principal agreement. Imperator Realty Co. v. Tull, 228 N.Y. 447, 452–453, 127 N.E. 263 (1920).

In this case, then, there is compelling reason to allow the trier of fact to determine what the true circumstances were; these circumstances cannot be tried on this motion. It should be emphasized that this Court has not passed on ultimate issues of fact, but has merely found them to exist. Since there are some questions of fact to be determined upon a trial, it is unnecessary to consider additional questions listed by the plaintiff as proper issues for fact determination.

The motion for summary judgment in favor of the defendants on the complaint and counterclaims is denied.

Finally, the defendants move for an order pursuant to Fed.R.Civ.P. 26(c) "permitting defendants to have a reasonable opportunity for discovery of plaintiff limited to any issue of fact which . . . is found [on the summary judgment motion] to be in dispute to

9. U.C.C. § 8–319.

be followed by any discovery sought by plaintiff to be similarly limited in scope." Their motive in making this motion is a fear that the plaintiff will seek to pry into the financial affairs of Bruce Norris and his family-held corporation Norris Illinois.

While it is obvious that this Court has the power to protect a party from harassment, it is better not to straight-jacket the discovery procedure in advance on the basis of speculative assumptions. Instead, the defendants should move against specific discovery sought by the plaintiff, if that proves necessary. In the meantime, this Court will rely on the good faith of counsel.

Therefore, the defendants' motion is denied in its entirety.

It is so ordered.