**SILVER AIR, Plaintiff,**

v.

**AERONAUTIC DEVELOPMENT CORPORATION LIMITED, Defendant.**

**No. 86 Civ. 1802 (RWS).**

United States District Court, S.D. New York.

Jan. 7, 1987.

Bruno Schachner, New York City, Ginsburg, Feldman and Bress, Washington, D.C., for plaintiff; Myer Feldman, Robert W. Hawkins, Bruce Rabinovitz, of counsel.

Breed, Abbott & Morgan, New York City, for defendant; James D. Zirin, Jeffrey D. Chansler, of counsel.

SWEET, District Judge.

Defendant Aeronautic Development Corporation Limited ("ADC") has moved for an order dismissing the complaint against it pursuant to Fed.R.Civ.P. 56. Plaintiff Silver Air ("Silver Air") opposes the motion and has cross-moved for summary judgment. Argument was held on October 10, at which parties were granted leave of court to supplement their filings. The case was finally submitted on November 13, 1986.

For the reasons set forth below, ADC's motion is granted with respect to Counts II–V. With respect to Count I, ADC's motion is granted in part and denied in part, and Silver Air's motion is granted in part and denied in part.

**Facts**

This is an action for return of a $220,000 deposit given by Silver Air to ADC in connection with the parties' Aircraft Modification Agreement entered into September 5, 1984 (the "Agreement"). Pursuant to the Agreement, ADC was to install "hushkits" on the engines of airplanes to be purchased by Silver Air to enable them to meet Federal Aviation Administration ("FAA") noise emission standards.

Silver Air was incorporated in July, 1983 in California for the purpose of establishing and operating an airline to provide direct passenger service from the West Coast of the United States to the Hawaiian Island of Maui. Silver Air planned to use DC–862 aircraft. ADC was founded in October, 1983 as a British Virgin Island corporation for the purposes of developing, manufacturing, and installing "hushkits" on DC–8–62 and DC–8–63 aircraft. Hushkits were necessary to comply with the FAA noise abatement standards that were to go into effect on January 1, 1985.

The Agreement required ADC to modify four Silver Air aircraft to enable them to meet the noise abatement standards. The Agreement also provided an option to Silver Air to have four additional aircraft modified under the Agreement. The purchase price for each modification was $2,800,000.

The Agreement further provided that as part of the purchase price, Silver Air was to deposit $50,000 for each modification, payable to ADC upon execution of the Agreement. In addition, Silver Air was to deposit $10,000 for each aircraft subject to the option which it wished to have modified. Pursuant to the Agreement, Silver Air paid ADC $220,000 in the form of a letter of credit representing the deposit for four aircraft and two additional aircraft under the option. The total value of the Agreement for the modification of the six aircraft was $16,800,000.

At the time the parties were negotiating the Agreement, Silver Air had not yet arranged for financing to purchase the aircraft and commence operations. Accordingly, Silver Air insisted that the Agreement provide for the return of its deposit under certain conditions. To this end, Sec-

tion 2.2 was added to the Agreement. It provides:

> The deposit ... shall be refunded in full to [Silver Air] without interest, if within 35 days from the date of this Agreement [Silver Air] shall advise ADC that [Silver Air] is unable to consummate the financing of its operations and, as a result thereof, does not presently intend to engage in business, in which case neither ADC nor [Silver Air] shall have any further obligation to the other. [Silver Air] agrees to keep ADC advised fully as to the progress of its financing arrangements during such 35–day period.

In addition, Section 17 of the Agreement provides:

> Except as otherwise expressly provided in this Agreement, all notices and requests required or authorized shall be given in writing either by personal delivery, by registered or certified mail or by telegraph or telex, and the date on which any such notice or request given by registered or certified mail or by telegraph or telex is received by the addressee shall be deemed to be the effective date of such notice or request.

After the Agreement was entered into in September, 1984, ADC and Silver Air agreed on ten occasions to extend the date contained in Section 2.2. Each of these extensions was accomplished in writing and signed by Martin A. Train ("Train"), president of ADC and Lita-Nadine Quetnick ("Quetnick"), vice-president of Silver Air. Each extension ran for, at most, one month each time. On one occasion the Agreement was extended for only five days. On three occasions, October 10, 1984, March 5, 1985 and April 30, 1985, Quetnick telexed Train of ADC purporting to cancel the Agreement unless a written extension of the agreement was entered into. Each of these telexes was sent on the last day of the time period within which Silver Air had the right to cancel. The final written extension of the date was to June 30, 1985, a total extension of just under nine months.

According to Silver Air, Quetnick spoke by telephone with Train on June 26 and 28 and told Train that Silver Air had not got-

ten the financing done and wanted the money back. According to Quetnick, Train said that he would give her the money back. She reports Train saying, "the deal's off if I send you your money back," to which Quetnick responded, "I know." Train denies that these conversations ever took place.

On July 3, 1985, Melvyn Croner ("Croner"), Quetnick's colleague and a director of Silver Air, sent ADC the following telex:

> Section 2.2 of the Aircraft Modification Agreement between ADC and Silver Air gives Silver Air the right to cancel the Agreement and receive a full refund of its deposit if by July 1, 1985 Silver Air has not completed its financing.

> Silver Air has no choice but to exercise its right to terminate its Aircraft Modification Agreement with ADC. Please wire transfer Silver Air's deposit with ADC for the amount of DLR 220,000 to the account of R.G. & M.E. Albrecht, Wells Fargo Bank, 10th & J. Branch, Sacramento, California USA. Account No. 0340-388057.

On July 9, 1985, Croner and Train spoke with each other. Croner recalls Train saying that, though he would have to check with ADC's board of directors, Silver Air should expect its deposit back shortly. Train recalls that he said that he would have to get approval from his board of directors and check the parties' legal obligations before he would return the deposit. Train says he made no commitment that Silver Air would get its money back.

By letter dated July 23, 1985, Robert Albrecht ("Albrecht"), the investor who had put up the $220,000 that Silver Air tendered to ADC, wrote to ADC directly. Albrecht wrote: "The funds comprising Silver Air's deposit to ADC are mine. I demand that they be returned ... immediately." In his letter, Albrecht repeated that Quetnick had orally cancelled the contract before June 30, that the cancellation had been followed up by telex on July 3, and that Train had promised Croner that the deposit would be returned shortly. Albrecht also added:

Among other provisions of the Agreement as amended, ADC did not obtain the STC by April 30, 1985, nor do the hushkits comply with the weight limitations set forth in the Agreement.

Section 18 of the Agreement provides:

The failure of either party to enforce at any time any of the provisions of this Agreement, or to exercise any option herein provided, or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a present or future waiver of such provisions, nor in any way to affect the validity of this Agreement or any part thereof, or the right of the other party thereafter to enforce each and every such provision. The express waiver by either party of any provision, condition or requirement of this Agreement shall not constitute a waiver of any future obligation to comply with such provision, condition or requirement.

ADC did not and has not returned Silver Air's deposit, hence this action by Silver Air.

## I. Written Notice

■ As already noted, Section 17 of the Agreement provides: "Except as otherwise *expressly* provided in this Agreement, *all* notices and requests required or authorized shall be given in writing." (emphasis added).

Silver Air argues that this clause does not cover Section 2.2 of the Agreement, which uses the word "advise" rather than the word "notice." The Agreement, Silver Air notes, does use the word "notice" elsewhere in the contract, which compels the conclusion that had the drafters meant to require written communication to satisfy Section 2.2, they would also have used "notice" there.

Furthermore, continues Silver Air, Section 2.2 requires Silver Air "to keep ADC advised fully as to the progress of its fi-

nancing arrangements...." According to Silver Air, this clause cannot fairly be interpreted to require written notices, and, therefore, "advise" must encompass oral advice.

Silver Air's arguments to the contrary notwithstanding, "to advise" and "to give notice" are legal synonyms.[1] More importantly, the structure of the contract itself and the parties' actions under it lead to the conclusion that "advise" in Section 2.2 demanded a writing. The Agreement is 22 single-spaced pages long, 25 counting attachments. It sets out the terms for a $16 million dollar transaction, almost a quarter-million of which (about 13%) was put down as a deposit. It allocates responsibilities and duties in detail and requires that notice be given in writing for various and sundry contingencies. That Section 2.2 requires written notice is borne out even by Silver Air's conduct before June 30; thrice before then Silver Air sent ADC conditional cancellations. All three times the cancellations were in writing, and all three were on the last day of the period in which Silver Air had the right to cancel.

## II. The Nature of the "Deposit"

■ In addition, Silver Air argues that allowing ADC to keep the deposit would work a forfeiture. While conceding that it failed to give ADC written notice by June 30, Silver Air claims that it did give ADC oral notice of cancellation (a fact which ADC disputes), and argues that, in any event, it certainly gave notice of cancellation by telex on July 3. Even if it technically failed to satisfy the requirements of Section 2.2, Silver Air asks the court to exercise its equitable powers and overlook the deficiency in notice on the grounds that Silver Air substantially complied with Section 2.2's requirements and that to do otherwise would turn the deposit into a penalty and subject Silver Air to a disfavored forfeiture. ADC, on the other hand, has

---

1. To "advise," says Black's Law Dictionary, is "to give notice." *Black's Law Dictionary* 50 (5th ed. 1979). Indeed, they are synonyms even in lay terms. Among the definitions in *The Shorter Oxford English Dictionary* 28 (3d ed. 1955) appears "To give (formal) notice." *See also Web-* ster's New Collegiate Dictionary* 18 (1977) ("to give information or notice to"). Similarly, *Roget's International Thesaurus* § 557.8, at 422 (4th ed. 1977) lists "advise" with "notify, give notice *or* notification, serve notice." (emphasis in original).

argued that the deposit is not a forfeiture, but is properly characterized as either a liquidated damages provision or as a kind of payment for an option.

Silver Air has directed the court's attention to Restatement of Contracts § 302, which, it should be noted, has been recrafted and appears in the Second Restatement as § 229, "Excuse of a Condition to Avoid Forfeiture." Section 229 provides:

> To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

Restatement (Second) of Contracts § 229 (1981).

This provision does not entitle Silver Air to the relief it seeks. In the first place, Section 2.2 was a "material" part of the Agreement. Silver Air demanded and received certain flexibility with regard to a deposit refund because of difficulties they foresaw (unfortunately, all too accurately) in obtaining financing. However, Silver Air did not receive unbounded flexibility. They were required to put down a sizeable deposit, and the no-strings refund policy of Section 2.2 was limited to a specific, short period: 35 days. As the fledgling companies each went about the business of putting their ventures together, they found it in their mutual interest to extend this period a number of times. Each extension, however, kept Section 2.2 on a short string; no single extension was for more than a month, and one was as short as five days. From the contract's original crafting through the various written extensions, the parties clearly considered the length of the refund period important, and both sides monitored it closely.

In addition, although Silver Air has argued that equity abhors a forfeiture, the issue remains here as to whether the loss of their deposit is indeed a forfeiture, or, as the Restatement requires, a "disproportionate forfeiture." *Restatement (Second) of Contracts* § 229 (1981). The notion of forfeiture, like that of penalty, is inextricably linked with the idea that the party collecting the money (whether it is termed a deposit, liquidated damages, or a penalty)[2] is unjustly enriched. Silver Air has focused primarily on the extent to which ADC was injured by tardy written notification of cancellation, and only to a lesser extent how it was harmed by a breach of the Agreement in its entirety. Plainly, the deposit was required to secure the deal as a whole, rather than, as is implicit in most of Silver Air's discussion, to secure only timely compliance with the refund notification provision.

In response to Silver Air's argument that the deposit is a forfeiture, ADC counters that instead it is either a liquidated damages provision or payment for an option. The opposing views notwithstanding, the Agreement itself reveals that the deposit was meant not as a penalty, nor as liquidated damages, nor as a fee for an option, but as security for reasonable compensation to ADC for services performed and materials purchased pursuant to the Agreement.

According to section 2.2 of the Agreement, the deposit paid upon execution of the Agreement was deemed the first payment towards the "Purchase Price" of the modifications. Section 2.4 lays out what happens to payments toward the Purchase Price in the event that Silver Air breaches by failing to make future timely payments and ADC declares Silver Air in breach:

> ADC shall be entitled to reasonable compensation for the value of all [hushkits] and other materials purchased and any services performed pursuant to this agreement. Should the payments previously made by [Silver Air] toward the purchase price exceed ADC's claim for compensation, ADC shall refund such excess amount to [Silver Air], without interest.

Although tailored to a specific circumstance, this provision clearly reveals the

---

**2.** Whatever a provision is called by contracting parties, the court will look behind the language of the true character of the provision. *See*

*Truck Rent-A-Center v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 425, 393 N.Y.S.2d 365, 369, 361 N.E.2d 1015, 1018 (1977).

essential nature of the deposit. As the first in a series of payments towards the Purchase Price, the Deposit was to ensure ADC that it would be paid for work *actually* done and money *actually* paid out if its struggling customer defaulted after the thirty-five day grace period but before the transaction was fully executed.

■ Consequently, ADC is entitled to keep whatever part of the deposit compensates it for actual services rendered and materials purchased, but only as much of the deposit as does so. Since factual questions have been raised regarding the extent and value of ADC's services and expenditures, both Silver Air and ADC's motions for summary judgment are denied on this issue.

### III. Oral Amendment of Section 2.2

■ Silver Air submits that Count II of its complaint, which alleges an implicit contract modification through the conduct and intent of the parties, cannot, by its very nature, be resolved on a summary judgment motion.

ADC contends that Silver Air is barred from proving the existence of this modification by Section 16 of the Agreement, which states:

> This Agreement and its Exhibits are the complete and exclusive statement of the terms and conditions of the entire agreement between the parties hereto.... This Agreement, and any term or condition hereof, shall not be varied, contradicted, explained or supplemented by an oral agreement or representation, by course of dealing or performance or by usage of trade, nor amended or changed in any other manner except by an instrument in writing of even or subsequent date hereto, executed by both ADC and [Silver Air]. ADC and [Silver Air] agree that at the time of execution hereof there are no other agreements, understandings, conditions, warranties, guaranties or representations, oral or written, express or implied, with respect to the subject matter of this Agreement that are not hereby merged or superseded.

In response, Silver Air argues that even a contractual provision requiring written amendments may be amended by subsequent oral agreement and conduct. *United States v. Gilman,* 360 F.Supp. 828 (E.D. Md.1973); *Neonex Inter. Ltd. v. Norris Grain Co.,* 338 F.Supp. 845 (S.D.N.Y.1972). Thus Silver Air's theory is: 1) that the parties amended Section 16 by conduct, and 2) that having amended Section 16 by conduct, they then amended Section 2.2 by conduct.

In support of this theory, the facts that Silver Air puts forward are that "Quetnick testified [at her deposition] that it was always her understanding that the deposit was to be refunded unless there was a further agreement to extend the deadline in Section 2.2. Mr. Croner's understanding was the same." (citations to record omitted).

On a motion for summary judgment, once the moving party has made out a prima facie showing that it is entitled to summary judgment, the burden is shifted to the non-moving party to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial. *Celotex Corp. v. Catrett,* ——— U.S. ———, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265 (1986).

In deciding what constitutes a genuine issue of fact, the court is essentially applying the same test as it does in deciding whether to grant a directed verdict. *Anderson v. Liberty Lobby, Inc.,* ——— U.S. ———, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

Here, Silver Air has not met the burden of coming forward with evidence sufficient to take to a jury the issue of amendment of the Agreement. That two of Silver Air's officers have testified that they "always" understood the contract to mean something does not raise an adequate factual issue as to whether original terms were subsequently *amended* by conduct. The evidence that Silver Air has produced—that the contract "always" meant the same thing—tends in-

stead to show that there was no change, no amendment.

■ In the alternative, Silver Air asks that summary judgment on this issue be denied so that they can further depose Train to try to develop evidence of amendment by conduct. As the Second Circuit has said, "a party [may not] rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). Thus, "a 'bare assertion that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment.'" *Id.* (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 251 (2d Cir.1985)). Here, Silver Air says that entries in Train's diary, only recently available to them, "may" bear on his conduct during the relevant periods, but do not reveal what entries raise questions or how they might conceivably be relevant. Since Silver Air's showing does not rise above speculation, its request for more discovery will not defeat summary judgment on this claim.

## IV. ADC's Breach

■ In Counts III–V, Silver Air contends that it is entitled to its deposit back because ADC breached the contract by failing to observe essential terms. According to Silver Air, ADC's shortcomings were: 1) ADC was supposed to obtain a Supplemental Type Certificate of Airworthiness ("STC") from the FAA by April 30, 1985, but did not do so until June 28, 1985; 2) ADC was supposed to certify by October 31, 1984 that a prototype hushkit has passed certain ground tests, but did not do so until November 30, 1984; 3) ADC had contracted that the installation of the hushkits would not increase the aircrafts' weight by more than 800 pounds apiece, but ADC told Silver Air that in fact the weight would be 1,000 pounds.

Silver Air points to Section 18 of the Agreement, which provides:

> The failure of either party to enforce at any time any of the provisions of this Agreement, or to exercise any option herein provided, or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a present or future waiver of such provisions, nor in any way to affect the validity of this Agreement or any part thereof, or the right of the other party thereafter to enforce each and every such provision. The express waiver by either party of any provision, condition or requirement to this Agreement shall not constitute a waiver of any future obligation to comply with such provision, condition or requirement.

This section is unavailing to Silver Air with regard to the first two of the charged deficiencies because at the time that Silver Air complained of them they had already been performed; ADC had obtained the STC and certified the ground tests long before Silver Air contended that there was a breach on those grounds.

■ Under Section 18, for the entire time between the date of non-occurrence and the time of compliance, the injured party can call the non-complier into breach; patiently awaiting compliance the first week an action is overdue does not, by the terms of Section 18, waive the right to decide that enough is enough and claim that the contract is breached at a later time. However, it does not allow a party to await performance patiently, allow the other party to perform, and only after they have done so claim, as Silver Air does here, that missing the first date cancels the whole deal. *See Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F.Supp. 821, 831 (S.D.N.Y.1969).

As to the third of Silver Air's charges—that ADC represented that it would increase a craft's weight by 1,000 pounds instead of the contracted 800 pounds—Silver Air has made out a case of anticipatory breach. That is, although the contractual time to weigh the planes (which is the technical time of performance) had not arrived, ADC represented that it would not comply when the time did arrive.

█ The general rule in a case of anticipatory breach, also known as "repudiation," is:

> When a promisor repudiates a contract, the injured party faces an election of remedies; he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time.

*Taylor v. Johnston,* 15 Cal.3d 130, 123 Cal.Rptr. 641, 539 P.2d 425, 430 (Sup.Ct. Cal.1975) (in bank). This is also the rule in New York. *See Tipple v. Tipple,* 189 A.D. 28, 177 N.Y.S. 813, 816 (1919); 22 N.Y. Jur.2d § 393 (1982). However, a contract that is not treated as broken continues to exist for the benefit of *both* parties. There is no specific time limit within which the non-repudiating party must elect his remedy, but if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default. *See Hadfield v. Colter,* 188 A.D. 563, 177 N.Y.S. 382, 390 (1919); 22 N.Y.Jur.2d at § 393.

█ This is exactly the situation here. ADC repudiated the provision of the contract that bound them not to increase the weight of such aircraft by more than 800 pounds. Silver Air chose, at that time, not to treat the repudiation as a default. Then, on July 3, Silver Air itself repudiated the contract by announcing that it did not have financing and was not going forward. ADC acted on this default by keeping the deposit as damages. Only on July 23, about three weeks after it had repudiated the contract, did Silver Air attempt to elect to accept ADC's earlier repudiation as a breach. But, because Silver Air had repudiated in the meantime, and ADC had accepted by retaining the deposit, Silver Air's election came too late.

### Conclusion

ADC's motion for summary judgment in its favor is granted with respect to Counts II–V, and Silver Air's motion with respect to those Counts is denied. Counts II–V are consequently dismissed.

As to Count I, summary judgment is granted in part in favor of ADC to the extent that Silver Air was required to give written notice to obtain a full refund, and failed to do so. However, Silver Air's motion for summary judgment on Count I is granted insofar as ADC is in breach of the Agreement by retaining any portion of the deposit beyond that which reasonably compensates it for actual services rendered and purchases made pursuant to the Agreement. Because a factual issue has been raised with respect to the extent and value of actual services rendered and purchases made, both parties' motions for summary judgment are denied on this point. The case will proceed to trial on the question of the extent and value of ADC's services and purchases pursuant to the Agreement from the date of its execution until July 3, 1985, the date of Silver Air's written repudiation.

IT IS SO ORDERED.