MARVEL ENTERTAINMENT GROUP, INC., Plaintiff,

v.

ARP FILMS, INC., Amerex Films, Inc. and Claude S. Hill, Defendants.

ARP FILMS, INC., Plaintiff,

v.

MARVEL ENTERTAINMENT GROUP, INC., Defendant.

Nos. 86 Civ 6751 (KC), 86 Civ 6759 (KC).

United States District Court, S.D. New York.

May 24, 1988.

Jared Stamel, Joseph Tabacco, New York City, for plaintiff.

Stephen Huff, Jamie Brickell, Pryor, Cashman, Sherman & Flynn, New York City, for defendants.

## MEMORANDUM OPINION

CONBOY, District Judge:

### BACKGROUND

This action arises out of a long but frequently contentious business relationship between Marvel Entertainment Group, Inc., and ARP Films, Inc. Marvel is the successor in interest to a series of corporations that have owned the copyrights to Spiderman and other fictional cartoon characters.[1] In 1968, Marvel and Krantz Films, Inc., entered into an agreement (the 1968 Agreement) which gave Krantz the right, *inter alia,* to produce and exploit animated cartoon films embodying various copyrighted and trademarked characters including Spiderman.

---

1. For purposes of clarity, Marvel and its predecessors will be referred to collectively as "Marvel."

In 1975, Marvel commenced an action before this Court seeking to terminate the rights granted to Krantz under the 1968 Agreement. While the action was still pending, Marvel entered into a new agreement (the 1976 Agreement) with ARP films, Inc., a Delaware corporation, and Claude S. Hill, the principal of ARP.[2] The 1976 Agreement permitted Hill, through ARP, to continue exploiting Marvel properties.[3] In return, ARP and Hill were obligated to remit certain specified percentages of their gross receipts back to Marvel and to provide Marvel with records of plaintiffs' exploitation of the Marvel properties. Shortly after the parties entered into the 1976 Agreement, this Court entered a consent judgment terminating all rights granted under the 1968 Agreement.

In July, 1986, ARP commenced an action against Marvel claiming that Marvel breached the 1976 Agreement by distributing the cartoons on videocassettes in disregard of ARP's allegedly exclusive right to do so, and by opposing a public offering of ARP's stock. Marvel responded by commencing an action against ARP, Amerex, and Hill seeking damages and a declaration that the contract had been terminated. Both actions were consolidated to form the present action. For purposes of clarity, ARP, Amerex, and Hill will be referred to as "plaintiffs."

In its motion for partial summary judgment, Marvel claims that, based upon undisputed facts, and as a matter of law, plaintiffs materially breached the 1976 Agreement by: (1) refusing, since March of 1987, to report the results of their exploitation of Marvel properties and withholding Marvel's share of such exploitation; (2) improperly transferring their rights and obligations under the agreement; and (3) permitting the ARP entity that was a party to the 1976 Agreement to be dissolved. Mar-

vel also contends that the duration of the 1976 Agreement is limited to a maximum of 15 years, and the agreement does not grant videocassette rights in the subject films.

## ANALYSIS

a. Election to Affirm the Contract

On November 12, 1986, James E. Galton, the President of Marvel, sent Hill a letter which purported to terminate all rights granted in connection with the 1976 Agreement. Despite the letter, plaintiffs continued to distribute the animated films but, since March of 1987, have neither paid Marvel its share of the distribution receipts nor accounted for such distribution as required under the contract. Marvel claims that notwithstanding Marvel's arguably wrongful repudiation of the contract in 1986, plaintiffs' decision to continue the contract and exploit their rights thereunder bound them to continue their obligations as well. Marvel contends that plaintiffs' failure to remit monies due and account for their distribution activities is a material breach of the agreement justifying Marvel's termination of the contract. Relying on the principles of anticipatory breach, plaintiffs contend that they had the right to withhold their own performance "to give Marvel an incentive to repent its repudiation."

When a party to a contract materially breaches that contract, the aggrieved party has two choices. He can cancel the contract and sue for total breach, Calamari & Perillo Contracts § 11–18 at 458 (3d ed. 1987), or he can affirm the contract and sue for partial breach. *Id.* When the aggrieved party chooses to affirm the contract "in spite of a known excuse, the defense thereupon is lost and the injured party *is himself liable if he subsequently fails to per-*

2. Hill had been the principal of Krantz, Inc.

3. The 1976 Agreement consisted of a Memorandum of Agreement dated September 16, 1976, and an amendment thereto dated September 24, 1976. By virtue of the 1976 Agreement, Marvel and ARP agreed to form "New Company" to distribute the cartoons covered by the agreement. The company formed to distribute the

cartoons is Amerex Films, Inc. Although the September 16 Memorandum provided for joint ownership of the new company, the September 24 amendment provided that the company would be owned by ARP. The nature and scope of the rights granted under the 1976 Agreement are otherwise in sharp dispute.

*form."* 22 N.Y.Jur.2d § 375 (emphasis added). *See also* 5 Williston On Contracts, § 688 at p. 300 (3d ed. 1961). The innocent party can affirm the contract by his conduct and, in this regard, "[t]he continued acceptance of benefits under the contract is the most common and clearest case of election [to affirm the contract] by conduct." *Cities Service Helex, Inc. v. United States,* 543 F.2d 1306, 211 Ct.Cl. 222 (1976). In the present case, plaintiffs have affirmed the contract by continuing to distribute the Marvel cartoons, but have failed, since March, 1987, to pay Marvel its share of the proceeds and to account to Marvel for the same.

Relying on the principles of anticipatory breach, *see* §§ 251–57 of the Restatement Contracts 2d, plaintiffs contend that they were entitled to continue distribution under the 1976 Agreement and withhold their own performance until Marvel withdrew its repudiation. Plaintiffs' reliance on the principles of anticipatory breach is misplaced for several reasons. First, a brief explanation of those principles would be helpful. Section 251 of the Restatement of Contracts 2d provides:

(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach ..., the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

(2) The obligee may treat as a repudiation the obligor's failure to provide within a reasonable time such assurance of due performance as is adequate in the circumstances of the particular case.

Without the alternative provided in Section 251 of the Restatement, an innocent obligee, confronted with an obligor's prospective unwillingness or inability to perform, would be placed in the difficult position of guessing whether the obligor will perform. If the obligee believes that the obligor will not perform and it turns out that he is wrong, the obligee's own failure to perform may subject him to liability. If the obligee ignores the obligor's apparent unwillingness to perform and continues his own performance, he runs the risk of never receiving the agreed upon return performance when that performance comes due. *See* Farnsworth, Contracts § 8.23 at 643–45 (1982). Under the Restatement, the obligor's failure to give adequate assurances that he will perform may be treated as a repudiation giving the obligee an immediate right to sue for total breach even though the obligor's performance is not yet due. Section 253 of the Restatement provides:

(1) Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

Assuming that plaintiffs were in a position to treat Marvel's repudiation as a total breach, plaintiffs had the right, as with any other material breach, to either terminate the contract or affirm it:

When a promisor repudiates a contract, the injured party faces an election of remedies; he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time. *Silver Air v. Aeronautic Development Corp. Ltd.,* 656 F.Supp. 170 (S.D.N.Y.1987) (quoting *Taylor v. Johnston,* 15 Cal.3d 130, 123 Cal.Rptr. 641, 539 P.2d 425 (1975).... However, a contract that is not treated as broken continues to exist for the benefit of *both* parties. There is no specific time limit within which the non-repudiating party must elect his remedy, but if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default. *Id.*

*See also North Country Rocky Point, Inc. v. Lewyt–Patchogue Co.,* 60 A.D.2d 258,

401 N.Y.S.2d 258 (2d Dep't 1978). Thus, even if plaintiffs were entitled to suspend their performance pending adequate assurances from Marvel, they forfeited their defense to performance by electing to affirm the contract.

Furthermore, under § 251 of the Restatement, an obligee can only suspend a performance "for which he has not already received the agreed exchange." *See First Nat'l Bank of Aberdeen v. Indian Industries*, 600 F.2d 702, 709 (8th Cir.1979) (nondefaulting party need not perform when it is clearly established that the promised *equivalent* will not be forthcoming); *Long Island R. Co. v. Northville Industries*, 41 N.Y.2d 455, 393 N.Y.S.2d 925, 362 N.E.2d 558 (1977) (for doctrine of anticipatory breach to apply, there must be some *dependency* of performances). Under the 1976 Agreement, plaintiffs receive the gross receipts from the distribution directly, and then pay Marvel its share. In effect, payments are due Marvel *after* plaintiffs have received the agreed exchange for such payments: the right to distribute Marvel properties and to receive a percentage of the proceeds therefrom. Thus, the principles of anticipatory breach are not applicable to the present dispute.

Accordingly, plaintiffs were not entitled to affirm and exploit their rights under the contract and at that the same time withhold their own performance indefinitely pending adequate assurances. Such a windfall is not sanctioned by any of the authorities cited by plaintiffs. The Court concludes, therefore, that to the extent plaintiffs affirmed the 1976 Agreement by exploiting Marvel properties and receiving the proceeds therefrom, plaintiffs breached the Agreement by failing to pay Marvel its share of such proceeds and by failing to provide records of the same. The Court, however, cannot say, as a matter of law, that the breach gives Marvel the right to terminate the contract. Materiality of breach is ordinarily a question of fact to be determined at trial. *See* Calamari and Perillo § 11–18 at 460.

b. Dissolution of ARP Delaware and Assignment of the Contract to ARP Tennessee.

■ The ARP Films, Inc. that signed the 1976 Agreement was a Delaware corporation which was dissolved on March 1, 1979 for failure to pay taxes. In 1978, a new corporation, also called ARP films, Inc., was incorporated in Tennessee. In a 1979 document executed by Hill, ARP Tennessee assumed or purported to assume all the rights and obligations of ARP Delaware. Marvel argues that the purported transfer of rights from the Delaware corporation to the Tennessee corporation and the dissolution of the Delaware corporation constituted material breaches of the contract justifying Marvel's termination thereof.

The 1976 Agreement prohibits the assignment of the contract by ARP or New Company (Amerex) and also provides that the agreement terminates automatically upon the insolvency of ARP. Accordingly, if the dissolution of ARP Delaware and the transfer of rights to ARP Tennessee were the only facts before the Court, Marvel's argument would be persuasive. However, "a stipulation against assignment may be waived or modified by a course of business dealings." *University Mews Associates v. Jeanmarie*, 122 Misc.2d 434, 471 N.Y.S.2d 457, 461 (Sup.Ct.N.Y.Cty.1983). Hill contends that he specifically advised Marvel of ARP's change from a Delaware to a Tennessee corporation. If so, Marvel may have waived the anti-assignment provision by accepting performance from ARP Tennessee. Moreover, if Marvel accepted the substitution of ARP Tennessee for ARP Delaware, then the subsequent dissolution of ARP Delaware may be irrelevant.[4] Summary judgment on these issues is, therefore, inappropriate.

c. Duration of the Agreement and Videocassette Rights.

■ Marvel contends that the maximum duration of the 1976 Agreement is 15 years. Plaintiffs claim that their rights

---

4. The evidence submitted by Marvel indicates that ARP Delaware was dissolved after the assignment of the contract to ARP Tennessee.

under the agreement continue in perpetuity.

Where the language employed in a contract is ambiguous or equivocal and the extrinsic evidence of the meaning of the contract presents a choice among reasonable inferences, the issue should not be resolved on summary judgment. *Airco Alloys Division v. Niagara Mohawk Power*, 76 A.D.2d 68, 430 N.Y.S.2d 179, 184 (4th Dep't 1980). The 1976 Agreement is ambiguous as to both its duration and the precise scope of the rights granted thereunder. Although the express terms of the agreement relating to duration suggest that the agreement would survive for a maximum of 15 years, those terms, along with several other provisions in the contract, are described in the 1976 Agreement as revisions of the 1968 Agreement. Moreover, the 1976 Agreement states that the 1968 Agreement is revised to "include" the terms governing duration. In light of these references to the 1968 Agreement, it is arguable that some of the terms of the 1968 Agreement, including terms governing duration, survived the 1977 consent judgment.

With respect to videocassette sales, the 1976 Agreement is simply not clear on the scope of the rights granted to plaintiffs. While it appears that Marvel intended to grant only limited rights to plaintiffs, the Court cannot determine, as a matter of law, that the right to distribute the cartoons through the sale of videocassettes is not among those limited rights.

Drawing all reasonable inferences in favor of plaintiffs, *see Donahue v. Windsor*, 834 F.2d 54 (2d Cir.1987), there are genuine issues of material fact precluding summary judgment on these issues.

SO ORDERED