Max Paul SAEWITZ and Lynn Jacqueline Saewitz, Plaintiffs,

v.

Edward N. EPSTEIN and Jeanne Sherman, Defendants.

No. 95–CV–1364.

United States District Court, N.D. New York.

May 12, 1998.

---

152

Riseley & Ball, Kingston, NY (Lawrence E. Ball, of counsel), for Plaintiffs.

Office of J. Michael Gottesman, New York City (J. Michael Gottesman, of counsel), for Defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

This action arises from two contract disputes between plaintiffs and defendants involving a lease and an option to purchase defendants' real property located in Woodstock, New York (the "property").

Plaintiffs, the lessees and optionees, commenced the present action in New York Su-preme Court, Ulster County, seeking, *inter alia*, the return of the following: (1) $30,000 paid to the defendants as consideration for an option to purchase the property; (2) $7,600 for costs incurred to survey the property; (3) $1,200 for costs incurred for a title examination; (4) $5,000 for legal fees (5) $4,000 representing the security deposit for the lease of the property; (6) $24,000 in rental payments; and (7) $4,511.54 for costs incurred to repair damage to the property caused by a winter storm.

Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. This Court has jurisdiction under 28 U.S.C. § 1332. In their Answer, defendants contest all of plaintiffs' claims. Defendants also assert a counterclaim for unpaid rent of $23,006 due under the lease and other expenses.

A two-day bench trial commenced in Binghamton, New York on December 22, 1997. At the close of plaintiffs' proof, the defendants moved pursuant to FED. R. CIV. P. 50 for judgment as a matter of law on a number of plaintiffs' claims. The Court granted defendants' motion with respect to plaintiffs' claims of defamation and *prima facie* tort. Defendants' motion was otherwise denied.

The Court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### (A) The Option Agreement and the Lease Agreement

1. Defendants are owners of approximately 93 acres of real property located in Woodstock, New York.

2. On November 24, 1994, plaintiffs and defendants entered into a written agreement (the "Option Agreement") whereby the defendants granted the plaintiffs an option to purchase the property.

3. Pursuant to the terms of the Option Agreement, plaintiffs paid to defendants the sum of thirty thousand dollars ($30,000) as consideration for the option.

4. Pursuant to paragraph 2 of the Option Agreement, the $30,000 option consideration was non-refundable unless (a) the defendants

failed to deliver marketable title to the property, and/or (b) the defendants' defaulted.

5. Pursuant to paragraph 6 of the Option Agreement, plaintiffs could exercise the option by giving written notice to the defendants, signed by the plaintiffs or their authorized agent, on or before August 15, 1995.

6. Pursuant to paragraph 7 of the Option Agreement, Title to the property had to close on or before November 23, 1995.

7. Pursuant to paragraph 13 of the Option Agreement, the defendants agreed to give and the plaintiffs agreed to accept such marketable title as The Title Service Company, Fair Street, Kingston, New York, agent for Fidelity National Title Company, would approve and insure, at standard rates, free and clear of all liens and encumbrances, except as otherwise provided in the Option Agreement.

8. On November 24, 1994 and simultaneous with the execution of the Option Agreement, the plaintiffs entered into a Lease Agreement with the defendants for the one-year lease of the property.

9. Pursuant to the terms of the Lease Agreement, the plaintiffs were to pay rent of $4000 per month, payable on the first day of each month for the length of the lease term, with aggregate lease payments of $48,000.

10. Pursuant to paragraph 33(a) and (b) of the Lease Agreement, the plaintiffs were required to pay for all repairs during the lease term, with the exception of structural repairs and replacements and repairs caused by acts of god.

**(B) The Winter Storm**

11. Plaintiff took occupancy of the property under the lease in the end of November 1994.

12. On or about December 24, 1994, a storm swept across the property. The storm caused exterior damage to the property. Specifically, various trees were felled, with one large tree leaning on the house; a gutter was shorn of the edge of the roof; shingles from the roof and the roof peak were damaged; an exterior stone window box and table were destroyed; several exterior lights were broken; and the tennis net was destroyed. Additionally, the storm felled several electrical poles causing the loss of electricity to the main residence.

13. The storm did not cause any interior damage to either the main or guest houses.

14. Within two days of the storm, electricity was restored through temporary means by connecting electrical cables to the guest house and running them along the surface of the property to the main house. Defendants also made arrangements for the removal of the large trees which had been felled, including the one tree leaning against the house. Small debris also was removed from the property at this time.

15. On December 26, 1996, defendants visited the property to determine the extent of the storm damage.

16. At this time, plaintiffs and defendants agreed that plaintiffs would make arrangements to hire an electrician from Miami to repair the electrical service, provided that plaintiffs' electrician submitted work estimates prior to commencing any repair work.

17. While repairing the electricity, the Miami electrician punctured an underground gas line.

**(C) The Rose Easement**

18. Richard Riseley represented plaintiffs in connection with the negotiation and execution of the Option Agreement and the Lease Agreement.

19. In early April of 1995, plaintiffs had the property surveyed by Robert Hall. Hall notified Riseley that an easement had been established over the property as a result of a lawsuit between defendants and Harrison and Eva Rose (the "Rose easement"). At no time had either defendants or their lawyer revealed the existence of the Rose easement to Riseley.

20. Prior to the execution of the Option Agreement, plaintiffs had the Title Service Company conduct a title search of the property. The title search, however, did not reveal the Rose easement.

21. After the surveyor notified Riseley of the Rose easement, Riseley immediately tele-

phoned defendants' lawyer, Gerry Wapner. Wapner acknowledged to Riseley that his law firm had represented defendants in the Rose litigation.

22. Upon learning of the existence of the Rose easement from Riseley, Mr. Saewitz "blew-up." Defendants had not previously disclosed the existence of the Rose easement to plaintiffs. Further, the Rose easement is not open and notorious. Mr. Epstein's testimony that he disclosed the Rose easement to Mr. Saewitz during an ATV ride across the property prior to the execution of the Option Agreement is not credible.

23. Approximately two weeks later, Riseley wrote a letter to Wapner regarding the Rose easement. Wapner responded by the same, explaining that Mr. Epstein had told him that the Rose easement had been disclosed to Mr. Saewitz prior to the execution of the agreements.

24. After receiving Wapner's letter, Riseley telephoned Wapner sometime during the end of April or early May of 1995. Riseley asked Wapner specifically to explain the defendants' position with respect to the Rose easement. Wapner told Riseley that, after speaking with the defendants, it was the defendants' position that if plaintiffs exercised their option to purchase the property, they would take subject to the Rose easement. Wapner also told Riseley that the option consideration was non-refundable. At no time did defendants offer to cure the Rose easement.

25. Thereafter, Riseley contacted the Title Insurance Company. The Title Insurance Company refused to insure the property free and clear of the Rose easement.

26. On May 22, 1995, after consulting with plaintiffs, Riseley wrote a letter to Wapner informing him that plaintiffs were terminating the Option Agreement and requesting the return of the $30,000 option consideration plus reimbursement for the costs of the survey, title examination and legal fees, as defendants had failed to disclose a material fact within their knowledge.

## (D) The Events of May 19, 1995

27. On or about May 19, 1995, plaintiffs began loading their furniture and other belongings on the property into a U–Haul truck, a pickup truck and plaintiffs' car. Plaintiffs were in the process of transporting these items back to their home in Miami, Florida. Robert Hart, a friend of the plaintiffs, was present at the property and was assisting with the moving.

28. As plaintiffs were loading their furniture and other belongings into the vehicles, a police officer arrived at the property. The police had received a complaint from defendants that the plaintiffs were stealing items from the property. After Riseley faxed a copy of the lease to the police department, the police officer left the property.

29. Plaintiffs resumed loading the vehicles. Shortly thereafter, defendant Mr. Epstein arrived at the property. Mr. Epstein was very upset and confused. Plaintiffs had not notified him that they were moving their furniture and other belongings to Florida. Mr. Epstein feared that plaintiffs might be stealing his property. A confrontation ensued with Mr. Epstein uttering several obscenities. Mr. Epstein also attempted to enter the home to determine if his property had been removed. Defendants prevented him from entering, and told him several times to leave the property. Defendants also called the police, who returned to the property. After an hour or so, Mr. Epstein left the property.

30. Plaintiffs left the property on either May 19 or 20, 1995. Plaintiffs took with them all of their furniture, belongings and other property. Nothing of plaintiffs was left behind, and they never returned to the property.

31. Shortly after arriving in Miami, plaintiffs terminated the lease.

## II. CONCLUSIONS OF LAW

### (A) The Option Agreement

Plaintiffs advance two theories to support their claims for recovery of the $30,000 paid as consideration for the Option Agreement and other related expenses. Their first theo-

ry is that defendants anticipatorily breached the Option Agreement by taking an untenable position with respect to the Rose easement. Plaintiffs' second theory is that defendants misrepresented the existence of the Rose easement, thereby entitling them to rescind the Option Agreement.

### (i) Anticipatory Repudiation

Turning to plaintiffs' claim of anticipatory breach, paragraph two of the Option Agreement provides that the option consideration is non-refundable unless (a) the defendants fail to deliver marketable title to the premises in accordance with the [Option] Agreement, and/or (b) the defendants default under the Option Agreement. Further, paragraph 13 of the Option Agreement states that:

> the [defendants] shall give and the [plaintiffs] shall receive such marketable title as the title Service Company ... will approve and insure, at standard rates, free and clear of all liens and encumbrances except as otherwise provided in this Agreement.

In early April of 1995, a survey of the property disclosed the existence of the Rose easement. The Rose easement had not been previously disclosed to either plaintiffs or their attorney. Upon learning of the Rose easement, the Title Service Company refused to insure the defendants' property free and clear. Thereafter, in response to inquiries by plaintiffs' lawyer regarding the Rose easement, defendants' lawyer stated that if plaintiffs exercised their option to purchase the Rose easement, they would take subject thereto.

According to plaintiffs, this statement constituted an anticipatory breach of the Option Agreement because defendants' position was untenable under the terms of the Lease Agreement. Though admittedly plaintiffs did not attempt to exercise the option, plaintiffs maintain that exercise was unnecessary in light of defendants' anticipatory repudiation.

■ It is firmly established that one who wrongfully renounces an obligation in contract should not be heard to complain when he is immediately sued by the non-breaching party. *See, e.g., Hochster v. De La Tour*, 118 Eng. Rep. 922 (Queen's Bench 1853). This principle, known as the doctrine of anticipatory repudiation, provides that when there has been a repudiation of the contract by one party before the time for his performance has arrived, the other party may treat the entire contract as breached and commence suit without delay. 22A N.Y. Jur.2d *Contracts* § 444 (1996). Resort to this doctrine is at the election of the non-breaching party. *See Sven Salen AB v. Jacq. Pierot, Jr., & Sons, Inc.*, 559 F.Supp. 503, 506 (S.D.N.Y.1983), *aff'd*, 738 F.2d 419 (2d Cir.1984). However, "there must be a definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action. Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract." *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 629 N.Y.S.2d 382, 385 (1st Dep't 1995) (citations omitted). The doctrine of anticipatory breach thus obviates the need for the non-breaching party to postpone suit until the time for performance of the other party has expired.

■ The doctrine of anticipatory breach, however, is a doctrine of limited application; it is ordinarily restricted to bilateral contracts embodying some mutual or interdependent obligations and conditions. *American List Corp. v. U.S. News and World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 593–94, 549 N.E.2d 1161 (1989); *Long Island R.R. Co. v. Northville Ind. Corp.*, 41 N.Y.2d 455, 393 N.Y.S.2d 925, 930–31, 362 N.E.2d 558 (1977); *Acacia Nat'l Life Ins. Co. v. Kay Jewelers, Inc.*, 203 A.D.2d 40, 610 N.Y.S.2d 209, 212 (1st Dep't 1994). The doctrine generally has not been recognized with respect to unilateral contracts. *See, e.g., Acacia Nat'l Life Ins. Co.*, 610 N.Y.S.2d at 212. This limitation is traditionally justified by relying on the idea "that the reason for holding an anticipatory repudiation to be a breach of contract is that otherwise the injured party must himself continue to be ready to perform on his own part.... [However, where] the injured party never had any

performance to render on his part, or, having such a performance, has already fully performed it, it would not be necessary for his protection to give him an immediate action for damages for the anticipatory breach." 4 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 962 (1951) (explaining and then criticizing this limitation).

In the present case, the contract at issue is an unexercised option contract. Simply put, an option contract is an enforceable promise not to revoke an offer. Before being exercised, the option contract is a unilateral contract. Upon exercise, it becomes a bilateral contract. The optionee has the choice whether to exercise the option; if he does, each party is required to perform their obligations under the resulting bilateral contract. *See id.* § 259.

The threshold issue is thus whether, under New York law, the doctrine of anticipatory repudiation applies to an unexercised option contract. A review of the case law reveals that this issue has not been directly addressed by the New York courts. As a federal court sitting in diversity, this Court must therefore strive to predict how the highest court of New York would answer this question. *See, e.g., Sphere Drake Ins. v. P.B.L. Entertainment, Inc.,* 30 F.3d 21, 22–23 (2d Cir.1994), *vacated on other grounds,* 52 F.3d 22 (2d Cir.1995).

As a general matter, New York courts have recognized application of the doctrine of anticipatory breach to contracts for personal services and contracts for the sale of goods and land. *See Long Island R.R. Co.,* 393 N.Y.S.2d at 931, 362 N.E.2d 558; *Kelly v. Security Mut. Life Ins. Co.,* 186 N.Y. 16, 19, 78 N.E. 584 (1906) (citations omitted). Conversely, New York courts have rejected application of the doctrine to contracts for the payment of money only in exchange for consideration previously executed (e.g., contracts such as promissory notes and insurance policies). *See Acacia Nat'l Life Ins. Co.,* 610 N.Y.S.2d at 212–13 (corporate notes); *Kelly v. Security Mut. Life Ins. Co.,* 186 N.Y. at 19, 78 N.E. 584 (life insurance policy). Admittedly, an unexercised option contract to purchase real property does not fall neatly into any of the above scenarios; it is instead more

of a hybrid, as an option contract is a unilateral obligation until exercised, becoming bilateral only if exercised by the optionee.

It should be recognized, however, that the actual exercise of an option contract by the optionee is the performance of a condition precedent to the optionor's duty to perform. 4 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 264 (1951). Thus, recognizing the application of the doctrine of anticipatory repudiation in the context of an unexercised option contract, thereby excusing the optionee from his ceremonious performance of this condition, accords with the doctrine's purpose. To hold otherwise would be antithetic to the doctrine's goal of eliminating unnecessary economic waste and inefficient outlays of resources. *See DeForest Radio Telephone and Telegraph Co. v. Triangle Radio Supply Co.,* 243 N.Y. 283, 293, 153 N.E. 75 (1926); *see also Hermanowski v. Acton Corp.,* 580 F.Supp. 140, 143 (E.D.N.Y. 1983) (noting that defendant's attempt to terminate plaintiff's irrevocable and unexercised stock option contract may be treated as anticipatory breach), *aff'd in part and remanded in part on other grounds,* 729 F.2d 921 (1984).

Having determined that the doctrine of anticipatory repudiation applies to the option contract at issue, the Court finds that plaintiffs' claim of anticipatory repudiation must nonetheless fail. Assuming, without deciding, that the defendants unequivocally repudiated the option contract by taking the position that the plaintiffs would take subject to the Rose easement should they exercise their option to purchase the property, plaintiffs have failed to demonstrate, as they must, that they were ready, willing and able to perform their part of the bargain. *See, e.g., Towers Charter and Marine v. Cadillac Ins. Co.,* 894 F.2d 516, 523–24 (2d Cir.1990); *Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.,* 60 N.Y.2d 997, 471 N.Y.S.2d 267, 267, 459 N.E.2d 492 (1983).

First, Mr. Saewitz testified in deposition that he could not answer whether he would have been willing to purchase the property upon learning that the Title Service Company would not insure the property free and

clear of the Rose easement. Second, plaintiffs' conduct in May 1995 of returning to Florida and terminating the lease belie any interest they may have expressed in exercising the option. Third, paragraph 6 of the Option Agreement permitted exercise of the option only if there were no material uncured defaults under the Lease Agreement. However, by May 22, 1995, the date plaintiffs rescinded the Option Agreement, plaintiffs had committed a material default under the lease by vacating the premises. Thus, plaintiff had no ability to exercise the option contract even had they elected to do so.

Accordingly, because plaintiffs have failed to show that they were ready, willing and able to perform under the option contract, their claim of anticipatory repudiation must fail.

### (ii) Rescission by Fraud

Plaintiffs next assert that they are entitled to rescind the option contract on the grounds of fraud and misrepresentation because defendants represented in paragraph 13(c)(3) of the Option Agreement that no judgments encumbered the premises, when, in fact, the Rose easement encumbered the property.

"False statements and misrepresentations as to the existence of ... encumbrances ... constitute actionable fraud...." 60 N.Y. Jur.2D *Fraud and Deceit* §§ 68–69 (1996); *see also Junius Const. Co. v. Cohen,* 257 N.Y. 393, 400, 178 N.E. 672 (1931); *Spivak v. Farkas,* 217 A.D.2d 430, 629 N.Y.S.2d 45, 45 (1st Dep't 1995); *Chery v. Anthony,* 156 A.D.2d 414, 548 N.Y.S.2d 535, 537 (2d Dep't 1989); *In Re Caulfield,* 192 B.R. 808, 820 (Bankr.E.D.N.Y.1996).

Here, there is no dispute that defendants had knowledge of the judicially-created Rose easement. It also is not disputed that the law firm representing defendants in the present case also represented defendants in the state court action resulting in the establishment of the Rose easement. Notwithstanding, neither defendants nor their lawyer ever disclosed the existence of the Rose easement to either plaintiff or their lawyer.[1] Rather,

plaintiffs did not discover the existence of the Rose easement until they had a survey done of the property in the spring of 1995.

 Defendants counter that even if a misrepresentation had been made, the misrepresentation was not material because the easement covered less than 1 percent of the property. This assertion, however, overlooks the testimony of Mrs. Saewitz, who testified that the attraction of the property was its privacy and seclusion. Thus, the existence of the Rose easement was material.

In light of defendants' misrepresentation with regard to the existence of the Rose easement, plaintiffs are entitled to rescind the option contract and recover the $30,000 paid as consideration for the option. Additionally, plaintiffs are entitled to recover $5,950 in expenses, which includes the costs of a title examination ($1,200), property survey ($3,750) and legal fees ($1,000).

### (B) The Lease Agreement

### (1) Plaintiffs' Claims

### (i) Recovery of $24,000 in Rental Payments

In support of their claim for recovery of $24,000 in rental payments, plaintiffs argue that they were constructively evicted from the property as defendants breached the covenant of quiet enjoyment in the lease (1) by failing to repair the property following the winter storm, and (2) as a result of the May 19, 1995 incident.

 The "covenant of quiet enjoyment insulates the tenant against acts or omissions on the part of the landlord ... which interfere with the tenant's right to the use and enjoyment of the premises for the contemplated purposes." 49 Am.Jur.2D *Landlord and Tenant* § 601 (1995); *Benitez v. Restifo,* 167 Misc.2d 967, 641 N.Y.S.2d 523, 524 (N.Y.City Ct.1996); *Beneficial Capital Corp. v. Richardson,* 1995 WL 324768, *1–2 (S.D.N.Y.1995). To establish a claim for breach of the covenant of quiet enjoyment, a

---

1. Although Mr. Epstein testified that he disclosed the existence of the Rose easement to Mr. Saewitz during an ATV ride of the property prior to the execution of the lease and option agreements, the Court finds this testimony not credible.

plaintiff must have been actually or constructively evicted. *See, e.g., White v. Long,* 85 N.Y.2d 564, 626 N.Y.S.2d 989, 990, 650 N.E.2d 836 (1995).

■ In this case, with respect to the damage caused by the winter storm, the evidence at trial clearly established that defendants timely commenced repair of all damaged items. Thus, contrary to plaintiffs' assertion, the damage from the winter storm did not substantially interfere with plaintiffs' beneficial enjoyment of the property such as to constitute a constructive eviction. *See Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 308 N.Y.S.2d 649, 653, 256 N.E.2d 707 (1970); *Hidden Ponds of Ontario, Inc. v. Hresent,* 209 A.D.2d 1025, 622 N.Y.S.2d 168, 169 (4th Dep't 1994). Furthermore, plaintiffs have not proved, as they must, that they terminated the lease because of defendants' alleged failure to make proper storm repairs.

With respect to the May 19, 1995 incident involving Mr. Epstein's visit to the property during plaintiffs' unannounced move from the premises, Mr. Epstein's conduct was not so grossly insulting or threatening to constitute a constructive eviction and breach of the covenant of quiet enjoyment. *See Hartman v. New York State Div. Of Housing and Community Renewal,* 158 A.D.2d 330, 551 N.Y.S.2d 18, 18–19 (1st Dep't), *appeal denied,* 76 N.Y.2d 705, 560 N.Y.S.2d 128, 559 N.E.2d 1287 (1990); *Gillingham v. Goldstone,* 21 Misc.2d 690, 197 N.Y.S.2d 237, 238 (N.Y.Mun.Ct.1959).

In short, the evidence is completely lacking that defendants deprived plaintiffs or their quiet enjoyment of the property as a result of either a failure to repair damages caused by the winter storm or as a result of the May 19, 1995 incident, or both. As such, plaintiffs' claims for return of rental payments is denied.

### (ii) Recovery for Repairs to Property as a result Of the Winter Storm

Plaintiffs also seek recovery from defendants of $4,511.43 allegedly expended on electrical installation and other repairs caused by the winter storm.

■ The terms of the Lease Agreement obligated defendants to make all repairs necessitated by acts of god. Thus, defendants had the burden to repair all property damage caused by the winter storm. Notwithstanding, plaintiffs apparently desired to utilize the services of their own electrician, and therefore requested the defendants' permission to hire an electrician from Miami and be reimbursed by defendants for their out-of-pocket expenses. Defendants consented to plaintiffs' request during a visit to the property on December 26, 1994, provided that the plaintiffs submitted estimates for the electrician's work prior to the commencement of any repairs.

Taking each expense in turn, plaintiffs first seek recovery for labor costs of $350 allegedly incurred to repair the electricity on December 23–24, 1994. Problematically for plaintiffs, the winter storm did not occur until December 23, 1994, and the evidence at trial established that plaintiffs' electrician did not begin electrical repair until December 27, 1994. Defendants also did not authorize plaintiffs to utilize their electrician until they visited the property on December 26, 1994. Thus, the $350 in labor costs is not recoverable.

Similarly, plaintiffs seek the recovery of $308 for their electrician's plane ticket dated December 24, 1994. However, defendants did not authorize plaintiffs to utilize their electrician until several days later. Thus, plaintiffs were not authorized to incur this expense.

Plaintiffs also seek recovery of $114.59 allegedly paid to Heritage Energy for the repair of a punctured gas line. However, there is no evidence that plaintiffs ever paid this bill; in fact, the evidence at trial demonstrated that the bill was actually paid by defendants.

With respect to plaintiffs' claims for recovery of supplies purchased from Ulster Electric for $1,500.77 and $342.89, plaintiffs have failed to establish that these amounts were incurred in connection with the repair of the property. Thus, these expenses are not recoverable.

Plaintiffs also seek recovery of $1,200 in labor costs for electrical installation completed by the Miami electrician from December 25 to December 30, 1994. As noted above, however, the evidence at trial indicated that the Miami electrician did not begin work until December 27, 1994. Plaintiffs have, moreover, failed to substantiate these labor costs in any manner. Defendants, in fact, made several requests to plaintiffs to substantiate their expenses, which they never did. Plaintiffs further provided no evidence that an estimate for the electrician's work was ever provided to defendants prior to the plaintiffs' electrician commencing the repair work. As such, plaintiffs may not recover for $1,200 in claimed labor costs.

With respect to the remaining claimed expenses, the plaintiffs provided sufficient proof at trial that these expenses were incurred in connection with property repair caused by the winter storm. Accordingly, plaintiffs are entitled to reimbursement from defendants for these expenses in the total amount of $695.29.

### (iii) Recovery of Security Deposit

Plaintiffs also seek recovery of their $4,000 security deposit, which defendants admittedly have not returned. However, because plaintiffs breached their obligations under the lease, *see infra* at 160, this amount must be applied to offset defendants' damages.

### (2) Defendants' Counterclaims

### (i) Recovery for Unpaid Rent Due under the Lease

Defendants' first counterclaim is for unpaid rent due under the lease of $23,006. Because plaintiffs breached their lease by vacating the property, terminating the lease, and ceasing to make rental payments due thereunder for the remaining months of June, July, August, September, October and November, defendants are entitled to recovery of this amount.

### (ii) Recovery for Maintenance Costs

Defendants next seek recovery for maintenance and utility costs of $5,214.52, which plaintiffs allegedly never paid.

By the terms of the Lease Agreement, plaintiffs were obligated to bear the costs of all repairs to the property, excluding damages to the property from acts of god. In addition, plaintiffs were obligated to pay for all ground care of the property. The lease specifically noted that ground care and handyman services currently were being furnished by A.J. Rose, a nearby neighbor, and that plaintiff must continue to maintain the grounds in appropriate condition either by utilizing the services of A.J. Rose or by using plaintiffs own employers or agents.

Defendants have submitted invoices and evidence of corresponding payments to A.J. Rose in the amount of $2,466.25 for work done by Rose during the lease term. However, the work invoices submitted by A.J. Rose do not always distinguish between work done with respect to storm damage repair, which defendants were obligated to pay, and other repair work, which plaintiffs were obligated to pay. Indeed, at trial, Mr. Epstein testified that Rose participated in property repair following the winter storm.

After review, the Court finds that defendants have adequately substantiated repairs to the property which plaintiffs were obligated to pay for in the amount of $2,122.25. This amount reflects consequential damages flowing from the breach insofar as defendants paid Rose to make periodic house checks of the vacated property. Defendants have failed to establish their entitlement to reimbursement for the balance.

Turning to defendants' remaining claims, defendants have sufficiently established that they paid $653.74 to Central Hudson, $153.54 to NYNEX, and $1,940.00 to Art Daley for pool maintenance, all of which plaintiffs were obligated to pay pursuant to the Lease Agreement. Accordingly, defendants may recover the additional amount of $2,747.28 from plaintiffs.

### (iii) Recovery for Repair of Ruptured Gas Line

Defendants next seek recovery of $114.59 paid to Heritage Energy for repair of a gas line which plaintiffs' electrician rup-

tured. Defendants may recover this sum as the figure reflects damage to the property caused by the negligence of plaintiffs' electrician, who was not authorized to commence these repairs.

### (iv) Recovery for Repair of Carpet

Defendants next seek recovery of $265.71 for carpet cleaning. Under the terms of the Lease Agreement, however, plaintiffs are not required to pay for ordinary wear to furnishings. As defendants have offered no evidence that the carpet cleaning was necessitated by reason other than ordinary wear, their request for recovery is denied.

### (v) Recovery for Repair of a Pump

Lastly, defendants seek recovery for the repair of a pump. However, as defendants have failed to establish how the pump was damaged (i.e., whether by the winter storm or otherwise), or whether the pump was covered by defendants' insurance, their claim must be denied.

### III. CONCLUSION

Based on the above findings of fact and conclusions of law, judgment should be entered for plaintiffs in the amount of $12,-655.17.

**IT IS SO ORDERED.**