### In re RANDALL'S ISLAND FAMILY GOLF CENTERS, INC., et al., Debtors.

### Nos. 00 B 41065 through 00 B 41196.

United States Bankruptcy Court, S.D. New York.

April 19, 2001.

Hartman & Craven LLP, Mark R. Kook, Victor M. Metsch, of counsel, New York City, for Gary Gelman.

Golenbock, Eiseman, Assor & Bell, Jonathan L. Flaxer, Jacqueline G. Veit, New York City, for debtors.

## MEMORANDUM DECISION AND OR-DER DENYING MOTION FOR SUMMARY JUDGMENT

STUART M. BERNSTEIN, Chief Judge.

Gary Gelman paid a $100,000.00 deposit to the debtors in connection with his irrevocable bid for one of the debtors' leases. After he attempted to withdraw the bid, the debtors sold the lease to a third party and refused to return his deposit. Gelman thereafter moved to compel the debtor to return the deposit, and by agreement of the parties, the Court is treating his application as a motion for summary judgment.

The submissions establish as a matter of law that Gelman improperly repudiated his obligation to keep his irrevocable bid open. Nevertheless, the record does not permit the Court to decide whether the debtors notified Gelman that he was the successful bidder or that they were ready, willing and able to close but for his repudiation. As a result, the motion is denied, and the Court will conduct a trial limited to these open issues. *See* Fed.R.Civ.P. 56(d).

## BACKGROUND

At all relevant times prior to bankruptcy, the debtors operated golf driving ranges and related facilities, skating rinks and family entertainment centers. They filed their chapter 11 petitions on May 4, 2000. As the cases developed, the debtors sold or otherwise disposed of many properties, and eventually decided that they could not continue to operate the remaining ones. Accordingly, they proposed to auction those that were left.

The Court approved bidding procedures (the "Procedures") in connection with the auction. The Procedures pertinent to this dispute required the prospective bidder to deliver a prescribed bid package together with a 10% deposit. (Procedures ¶¶ 4, 12.) The submission of a conforming bid package made the prospective bidder a Qualified Bidder. (*See id.* ¶ 6.) All bids—not just Qualified Bids—were irrevocable until the earlier of the closing or thirty days after the auction. (*Id.* ¶ 5.)

The Qualified Bidders were entitled to participate in an open auction to be conducted by the debtors. (*Id.* ¶ 15.) The debtors planned to sell the property to the bidder making the highest and best offer, but "[f]ormal acceptance of a Bid will not occur unless and until the Court enters an order approving and authorizing the Debtors to consummate the transaction with the Successful Bidder(s) or their respec-

tive designated assignee." (*Id.* ¶ 17.) The debtors reserved the right, after consultation with the Creditors' Committee and the Chase Manhattan Bank, their pre and post petition secured lender, to reject any bid deemed to be inadequate, insufficient, not in conformity with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Procedures, or contrary to the best interests of the debtors, their creditors or their estates. (*Id.* ¶ 19.)

At the conclusion of the auction, the debtors would identify the Successful Bidder and a Back–Up Bidder on each property, (*id.* ¶ 18), and hold their deposits in escrow until the earlier of the closing or thirty days after the auction. (*Id.* ¶ 12.) The other deposits would be returned within five days. (*Id.*) The Successful Bidder was obligated to close within ten days of the entry of the order approving the transaction. (*Id.* ¶ 20.) If the Successful Bidder failed to close, the Back-up Bidder would become the Successful Bidder without further order of the Court, and subject to the Successful Bidder's obligations to close. (*Id.* ¶ 21.) The debtors were entitled to keep the deposit if the Successful Bidder breached the obligation to close. (*Id.*) If, on the other hand, the failure to close was the debtors' fault, the debtors' "sole obligation and liability shall be to refund the deposit to the Bidder." (*Id.* ¶ 13.)

On or about February 5, 2001, Gelman submitted a $1 million bid for the real and personal property located at the debtors' Skydrive facility in Farmingdale, New York.[1] Skydrive was a leased property, and under the Procedures, Gelman had to attach certain documents to his bid package. They included, *inter alia,* a copy of the pertinent lease and a title report, which were designated, respectively, as exhibits A and E to the proposed contract

for the assumption of the lease. Gelman's bid package omitted these two attachments.

As a result, Charles Rich, Esq., one of the debtors' attorneys, wrote to Gelman on February 7, 2001. Rich advised Gelman that in order to qualify, the missing exhibits had to be added to the bid package. In addition, Rich stated that a clause in the Assignment of Licenses and Permits and Assumption Agreement that referred to trade names—which Gelman had not filled in—should be deleted. The proposed deletion reflected the fact that the Skydrive property did not involve any trade names. The February 7th letter concluded with a request that Gelman contact Rich if the three corrections were not acceptable. If Gelman did not contact debtors' counsel by the time and date specified in the letter, "we will assume that these modifications and/or additions are acceptable to you, and your bid will be deemed modified accordingly." Gelman did not respond.

The debtors conducted the auction two days later. Gelman did not attend, and no one interposed another bid. The highest bidder and the back-up bidder were selected from the written bids submitted before the auction. (*Affidavit of Charles B. Rich in Opposition to Gary Gelman's Motion to Recover Bid Deposit,* sworn to Mar. 30, 2001 ("*Rich Affidavit*"), at ¶ 6.) Gelman had made the second highest bid at $1 million, making him the Back–Up Bidder under the Procedures.

On February 15, 2001, Rich called Joel Frank, Esq., Gelman's attorney, to advise him that the "highest bidder on the Property appeared to be defaulting [and] that the Debtors might therefore be assigning the lease to the Property to Mr. Gelman." (*Rich Affidavit* ¶ 7.) He asked Frank to

---

1. Gelman also bid on one other property, but that bid is not the subject of litigation.

send Gelman's financial information which was needed to demonstrate adequate assurance of future performance. (*Id.*) Frank called back later to advise Rich that his client was withdrawing his bid, and Rich subsequently received a confirming fax. (*Id.*) Rich returned the fax with a notation advising Frank that "[p]er the bidding rules, Mr. Gelman is not permitted to withdraw his offer." (*Id.* Ex. D; *accord id.* ¶ 8.)

In the main, the parties agree on what occurred up to this point. Thereafter, their versions disagree. According to Rich, he spoke to Frank several times during the next week. Rich advised Frank that Gelman's deposit was in jeopardy, but Frank confirmed that Gelman would not close. Frank initiated at least one call for the purpose of determining if the forfeiture of the deposit could be avoided or if the lease could be assigned to a third party for an amount equal to Gelman's bid. (*Id.* ¶ 9.)

Frank had a different recollection of his conversations with Rich. Rich told him on February 15th that Gelman's bid might be the successful one. (*Affidavit of Joel I. Frank*, sworn to Apr. 5, 2001 ("*Frank Affidavit*"), at ¶ 4.) During the following week, Frank spoke to Rich several times about the status of Gelman's bid, but Rich could not provide the information. (*Id.* ¶ 5.) Rich never told Frank that Gelman's bid was, in fact, the successful one, that a closing had been scheduled, that Gelman was expected to close or that the deposit would be forfeited. (*Id.* ¶ 6.) In addition, Frank never told Rich that Gelman would not proceed. To the contrary, he "kept on trying to find out from Rich if Gelman's bid was the successful bid, because it was only be at that time that Gelman would have to do anything." (*Id.* ¶ 7.) Frank did not learn that the debtors had deemed Gelman to be the Successful Bidder until

after the debtors had sold the property to a third party, and declared the Gelman deposit forfeited. (*Id.* ¶ 6.)

## DISCUSSION

■ The issues raised by the motion involve the interplay between common law concepts of repudiation and the election of remedies. Initially, however, Rich's February 7th letter was neither a rejection of Gelman's offer (*i.e.*, the bid) nor a counteroffer. Under ordinary principles of contract law, "expressions of assent by an offeree, which contain immaterial deviations from the original offer, do not constitute counter-offers but, rather, operate to bind the parties to an enforceable contract." *Knapp v. McFarland*, 344 F.Supp. 601, 613 (S.D.N.Y.1971), *aff'd in part & rev'd in part on other grounds*, 457 F.2d 881 (2d Cir.), *cert. denied*, 409 U.S. 850, 93 S.Ct. 59, 34 L.Ed.2d 92 (1972); *accord Schoenfeld v. Masucci*, 205 A.D.2d 749, 613 N.Y.S.2d 682, 682 (N.Y.App.Div.1994).

■ The February 7th letter was not a response to an offer in the usual sense; bids could only be accepted through the auction process. Nevertheless, the rules distinguishing between acceptances and counteroffers provide helpful guidance. Gelman concedes that the three items mentioned in Rich's February 7th letter were immaterial to his bid. The two exhibits were documents that Gelman should have but failed to include in his bid package. In addition, the trade name clause was superfluous because the proposed transaction did not involve a trade name. Rich's response simply clarified Gelman's offer, but did not alter its status as an irrevocable bid.

As a result, Gelman's failure to respond to the February 7th letter was immaterial. Since the February 7th letter was not a counteroffer, there was nothing for Gelman to accept through silence or other-

wise. Further, the request to contact debtor's counsel if Gelman had any problem with the three modifications was simply a courtesy. In truth, no response would have been expected given the immaterial alterations that Rich had proposed.

It appears that the Successful Bidder defaulted even before the debtors could obtain an order approving the transaction. Under the Procedures, Gelman became the Successful Bidder, and succeeded to the Successful Bidder's obligations.[2] Accordingly, Gelman became obligated to close, and if he failed to do so for reasons other than the fault of the debtors, he forfeited his deposit.

 It is undisputed that Gelman never closed. The debtors contend that Gelman repudiated his obligations prior to performance, causing an anticipatory breach of his obligation to close. Generally, an anticipatory breach occurs when a party to a contract declares his intention not to perform his future obligations. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656, 659 (1998); *De Lorenzo v. Bac Agency, Inc.,* 256 A.D.2d 906, 681 N.Y.S.2d 846, 848 (N.Y.App.Div.1998); JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 12–4, at 525 (3rd ed. 1987)("CALAMARI & PERILLO"); RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b (1979). Under New York law, an anticipatory breach, like any other breach, gives the non-breaching party two mutually exclusive options. He may elect to treat the contract as terminated and exercise his remedies, or contin-

ue to treat the contract as valid. *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d 383, 388 (S.D.N.Y.1999); *Strasbourger v. Leerburger,* 233 N.Y. 55, 134 N.E. 834, 835 (N.Y.1922); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.,* 259 A.D.2d 932, 686 N.Y.S.2d 911, 913 (N.Y.App.Div.), *leave to appeal denied,* 93 N.Y.2d 812, 695 N.Y.S.2d 540, 717 N.E.2d 699 (1999). If he elects to terminate the contract and sue for breach, he is excused from tendering his own performance; he need only show that was ready, willing and able to perform. *De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.,* 243 N.Y. 283, 153 N.E. 75, 78, *rearg. denied,* 243 N.Y. 618, 154 N.E. 629 (1926); *see Strasbourger v. Leerburger,* 134 N.E. at 836. If he elects to continue the contract, he cannot thereafter terminate it based on the earlier breach, but may still terminate the contract in the event of subsequent breaches. *ESPN, Inc. v. Office of the Comm'r of Baseball,* 76 F.Supp.2d at 387–88 (quoting *Bigda v. Fischbach Corp.,* 898 F.Supp. 1004, 1012 (S.D.N.Y.1995), *aff'd,* 101 F.3d 108 (2d Cir. 1996)); *Liberty Capital Mgmt., Inc. v. McCall,* 198 A.D.2d 166, 604 N.Y.S.2d 58, 59 (N.Y.App.Div.1993).

 There is no particular time within which the non-breaching party must make the election. *Marvel Entertainment Group, Inc. v. ARP Films, Inc.,* 684 F.Supp. 818, 820 (S.D.N.Y.1988)(quoting *Silver Air v. Aeronautic Dev. Corp. Ltd.,* 656 F.Supp. 170, 178 (S.D.N.Y.1987)); 22A N.Y. JUR. 2D, *Contracts* § 451, at 138 (1996). He may refuse, for a time, to

---

**2.** Gelman argues that neither he nor anyone else could be a Successful Bidder under the Procedures unless the Court entered an order approving the transaction. He is wrong. The debtors had to obtain an order authorizing them to consummate the assumption and assignment of a lease because § 365 requires

an order. They did not need a Court order simply to accept a bid. Further, as discussed below, the debtors were not required to go through the futile exercise of obtaining an approval order after the Successful Bidder repudiated his obligations.

acquiesce in the repudiation, and urge the repudiator to perform without waiving any of his rights. *S.D. Hicks & Son Co. v. J.T. Baker Chemical Co.*, 307 F.2d 750, 752 (2d Cir.1962); *Mindel v. Image Point Productions, Inc.*, 725 F.Supp. 189, 194 (S.D.N.Y. 1989); *Seven–Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F.Supp. 1015, 1023 (S.D.N.Y.1988); *Canda v. Wick*, 100 N.Y. 127, 2 N.E. 381, 382 (1885); CALAMARI & PERILLO § 12–8, at 530; RESTATEMENT (SECOND) OF CONTRACTS § 257 & cmt. a (1979); *see* N.Y.U.C.C. § 2–610 (McKinney's 1993). The repudiator may retract his repudiation until the other party has elected to terminate the contract or has materially changed his position in reliance on the repudiation. *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 120 S.Ct. 2423, 2436, 147 L.Ed.2d 528 (2000); CALAMARI & PERILLO § 12–7, at 528; RESTATEMENT (SECOND) OF CONTRACTS § 256(1)(1979); *see* N.Y.U.C.C. § 2–611(1).

 Until the election is made, both parties remain liable for their contractual performance. "If the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default." *Silver Air v. Aeronautic Dev. Corp. Ltd.*, 656 F.Supp. at 178; *accord Marvel Entertainment Group, Inc. v. ARP Films, Inc.*, 684 F.Supp. at 820. In addition, the non-repudiating party waives his right of election by accepting performance from the repudiator. *Id.*; *Biopharmaceutics, Inc. v. Primavera Lab., Inc.*, No. CV–94–3804, 1995 WL 362425, at *6 (E.D.N.Y. June 8, 1995); *see Hadfield v. Colter*, 188 A.D. 563, 177 N.Y.S. 382, 389–90 (N.Y.App. Div.1919).

 The same general rules govern this case. Gelman's irrevocable bid was essentially an option contract; Gelman was obliged to keep his offer open, but the debtors were not compelled to accept it. If they did, a bilateral contract with Gelman would arise. Gelman's attempt to withdraw his irrevocable offer prior to acceptance constituted an anticipatory repudiation. *Saewitz v. Epstein*, 6 F.Supp.2d 151, 157 (N.D.N.Y.1998); *see Hermanowski v. Acton Corp.*, 580 F.Supp. 140, 143–44 (E.D.N.Y.1983)(attempt to terminate plaintiff's irrevocable stock option was anticipatory breach), *aff'd in part & rev'd in part on other grounds*, 729 F.2d 921 (2d Cir. 1984). The debtors were not required to exercise the option in order to assert a claim for breach. Instead, they could immediately declare a breach and recover damages provided that they were ready, willing and able to exercise the option and perform the resulting bilateral contract. *Saewitz v. Epstein*, 6 F.Supp.2d at 157; *see United States Overseas Airlines, Inc. v. Compania Aerea Viajes Expresos de Venezuela, S.A.*, 246 F.2d 951, 952 (2d Cir.), *cert. denied*, 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957).

Although the parties dispute the substance of their lawyers' communications on and after February 15th, the disputes are largely immaterial. For example, they clash over whether Frank told Rich in a definitive manner that Gelman would not perform. Frank did not, however, contest the revocation. Moreover, he conceded that he never told Rich that Gelman would perform, saying that Gelman was awaiting confirmation that he was the Successful Bidder "because it would only be at that time that Gelman would have to do anything." (*Frank Affidavit* ¶ 7.) Even under Frank's scenario, these equivocal statements did not convey Gelman's unconditional intention to honor his bid, and were not sufficient to retract his earlier repudiation. *See* N.Y.U.C.C. § 2–611(2) ("[r]etraction may be by any method that clear-

ly indicates to the aggrieved party that the repudiating party intends to perform").

In this regard, Gelman misconstrues the legal effect of his repudiation. The debtors did not have to accept his bid before he had to decide whether to reinstate it—he had to retract his repudiation before the debtors were required to go through the possibly futile exercise of accepting his bid and declaring him the Successful Bidder. Until Gelman retracted his repudiation, the debtors were entitled to urge him to perform and suspend their own performance, without going through the additional steps of securing an approval order or scheduling a closing. In addition, they were entitled—and probably obligated eventually—to declare a default, mitigate the estates' damages and sell the property to a third party.

 While the foregoing is sufficient to dispose of Gelman's motion for summary judgment, two related issues remain that cannot be resolved as a matter of law. First, it is not enough that Gelman repudiated his bid; the debtors must show that but for the repudiation, they were ready, willing and able to accept Gelman's offer and close the transaction. According to both Rich and Frank, the debtors raised the possibility of accepting Gelman's bid, but the submissions do not establish that they actually did so, or did not because of the repudiation. In this regard, the Procedures authorized them to reject his bid for a host of reasons which would nonetheless have entitled him to the return of his deposit.

Second, although the Procedures do not expressly state that the debtors must advise the Back–Up Bidder that he has become the Successful Bidder, (*see* Procedures ¶ 21), the obligation must be implied if the debtors intend to keep his deposit. No specific form of notice is required as long as the substance of the information is communicated. The submissions agree to a point; Rich advised Frank that Gelman might become the new Successful Bidder. According to Rich, he also advised Frank that Gelman's deposit was in jeopardy, implying that he informed Gelman of his obligation to close. Frank, on the other hand, claimed or insinuated that Rich never told him that Gelman was the Successful Bidder, that he was obligated to close or that his deposit was in jeopardy.

Accordingly, Gelman's motion for summary judgment is denied, but the fact of his repudiation and his failure to retract it are deemed established. *See* Fed.R.Civ.P. 56(d). The parties are directed to contact chambers to schedule a trial on the remaining issues during the afternoon of an available date. I have considered Gelman's remaining arguments, and conclude that they lack merit.

So Ordered.